No. 24-5565

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

CONFEDERATED TRIBES OF THE COLVILLE RESERVATION,
Plaintiff-Appellant,

and

JOSEPH A. PAKOOTAS, an individual and enrolled member of the Confederated Tribes of the Colville Reservation, DONALD R. MICHEL, an individual and enrolled member of the Confederated Tribes of the Colville Reservation,
Plaintiffs,

STATE OF WASHINGTON,
Intervenor-Plaintiff,

v.

TECK COMINCO METALS, LTD., a Canadian corporation,
Defendant-Appellee.

Appeal from the United States District Court for the Eastern District of Washington
No. CV-04-0256-SAG, Chief Judge Stanley A. Bastian

# BRIEF OF THE UNITED STATES AS AMICUS CURIAE IN SUPPORT OF APPELLANTS

TODD KIM
*Assistant Attorney General*

DAVID S. GUALTIERI
JOSEPH M. MANNING
*Environment and Natural Resources Div.*
*U.S. Department of Justice*
*P.O. Box 7415*
*Washington, D.C. 20044*
*(202) 514-4767; David.gualtieri@usdoj.gov*

## TABLE OF CONTENTS


Table of Contents ........ ii

Table of Authorities ........ iii

INTEREST OF THE UNITED STATES ........ 1

SUMMARY OF THE ARGUMENT ........ 2

ISSUE PRESENTED ........ 2

STATEMENT OF THE CASE ........ 3

I. Legal background ........ 3

A. CERCLA ........ 3

B. Implementing regulations ........ 4

II. Statement of facts and procedural history ........ 6

ARGUMENT ........ 9

I. CERCLA authorizes natural resource damages for the lost uses asserted by the Tribes ........ 11

A. CERCLA entitles Indian tribes to damages for lost uses caused by injuries to natural resources. ........ 11

B. Interior's regulations recognize natural resource damages for the Tribes' lost uses and assessment methodologies. ........ 17

C. The district court erred in its interpretation of CERCLA's text, implementing regulations, and relevant precedent ........ 20

II. The interim lost use claims articulated by the Colvilles constitute "natural resource damages" for lost "use value" under CERCLA ........ 24

CONCLUSION ........ 27

## TABLE OF AUTHORITIES

### Cases


*Alaska Sport Fishing Ass'n v. Exxon Corp.*, 34 F.3d 769 (9th Cir. 1994) ................ 5, 15, 16

*Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863 (9th Cir. 2001) ............................ 13

*Coeur d'Alene Tribe v. Asarco Inc.*, 280 F. Supp. 2d 1094 (D. Idaho 2003) ........... 21, 22, 23

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ...................................... 11

*Idaho v. S. Refrigerated Transp., Inc.,* No. 88-1279, 1991 WL 22479, at *18 (D. Idaho Jan. 24, 1991) ........................................................................................................ 19

*In re Gold King Mine Release*, 669 F. Supp. 3d 1146 (D.N.M. 2023) .................................. 23

*Kaiser Alum. & Chem. Corp. v. Catellus Dev. Corp.,* 976 F.2d 1338 (9th Cir. 1992) .......... 13

*Kennecott Utah Copper Corp. v. U.S. Dep't of the Interior*, 88 F.3d 1191 (D.C. Cir. 1996) .. 20, 21

*Larson v. Saul,* 967 F.3d 914 (9th Cir. 2020) ............................................................... 11

*Lolli v. Cnty. of Orange*, 351 F.3d 410 (9th Cir. 2003) ......................................................... 27

*Nat'l Ass'n of Mfrs. v. U.S. Dep't of Interior*, 134 F.3d 1095 (D.C. Cir. 1998) .................... 13

*New Mexico v. Gen. Elec. Co.*, 467 F.3d 1223 (10th Cir. 2006) .................................... 13, 15

*Pakootas v. Teck Cominco Metals, Ltd. v. Pakootas*, 830 F.3d 975 (9th Cir. 2016) ................. 1

*Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565 (9th Cir. 2018) ............................ 6, 16

*Pennsylvania v. Union Gas Co.*, 491 U.S. 1 (1989) ............................................................... 3

*Pinal Creek Group v. Newmont Mining Corp.*, 118 F.3d 1298 (9th Cir.1997) ....................... 13

*Romag Fasteners, Inc.* v. *Fossil, Inc.*, 590 U.S. 212 (2020) ..................................................... 13

*Roth v. Foris Ventures, LLC,* 86 F.4th 832 (9th Cir. 2023) .................................................. 27

*State of Ohio v. U.S. Dep't of the Interior*, 880 F.2d 432 (D.C. Cir. 1989) .. 4, 5, 6, 16, 18, 19, 21, 25

*Teck Cominco Metals, Ltd. v. Pakootas*, 552 U.S. 1095 (2008) ................................................ 1

*Trim v. Reward Zone USA LLC*, 76 F.4th 1157 (9th Cir. 2023) ......................................... 11

*U.S. Commodity Futures Trading Comm'n v. Monex Credit Co.*, 931 F.3d 966 (9th Cir. 2019) ........................................................................................................................ 12

*United States v. Alcoa Inc.*, No. 7:13-cv-00337 (N.D.N.Y. July 17, 2013) .......... 1

*United States v. Asarco Inc.*, 471 F.Supp.2d 1063 (D. Idaho 2005) .......... 23

*United States, et al. v. Homestake Mining Co. of California*, No. 97-5100 (W.D.S.D. July 13, 1999) .......... 1

W*yler Summit P'ship v. Turner Broad. Sys., Inc.*, 235 F.3d 1184 (9th Cir. 2000) .......... 26

**Statutes**

28 U.S.C. § 1292(b) .......... 9

42 U.S.C. § 9601 .......... 1

42 U.S.C. § 9607(a) .......... 14

42 U.S.C. § 9607(a)(4)(A) .......... 3, 4

42 U.S.C. § 9607(f)(1) .......... 10, 14, 16, 21

42 U.S.C. § 9613(a) .......... 4

42 U.S.C. § 9651(c)(2) .......... 9, 12, 13, 14

42 U.S.C. § 9659(a)(1) .......... 7

**Other Authorities**

89 Fed. Reg. 16,498 (proposed Mar. 7, 2024) .......... 7

Exec. Order No. 12,316, 46 Fed. Reg. 42,237 (Aug. 20, 1981), as amended by Exec. Order No. 12,580, 52 Fed. Reg. 2,923 (Jan. 29, 1987) .......... 4

H.R. Rep. No. 99–253(IV), at 50 (1985), reprinted in 1986 U.S.C.C.A.N. 3068, 308015

Webster's New Collegiate Dictionary at 1279 (1979) .......... 12

**Regulations**

43 C.F.R. § 11.14(e) .......... 5

43 C.F.R. § 11.83(c)(1) .......... 24, 25, 26

43 C.F.R. § 11.83(c)(1)(i) .......... 5

43 C.F.R. § 11.83(c)(2) .......... 26

43 C.F.R. § 11.83(c)(3) .......... 26

59 Fed. Reg. 14,262 (Mar. 25, 1994) .......... 5

73 Fed. Reg. 57,259 (Oct. 2, 2008). .......... 5

## INTEREST OF THE UNITED STATES

The Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, expressly allows Indian tribes as trustees to recover damages for injuries to natural resources caused by releases of hazardous substances. The statute's authorized natural resource damages ("NRD") include the value of the lost use of the natural resources in question before a response action is completed, and thereafter in the event that the response action does not restore the natural resources to their baseline condition. As a CERCLA natural resource trustee, the United States routinely brings suit on behalf of the Department of the Interior ("Interior"), in partnership with Indian tribes, to recover damages for lost uses of injured natural resources.[1] Dozens of such claims are currently being developed and negotiated, including within the Ninth Circuit, where many Indian tribes reside. The United States thus has a significant interest both in the proper interpretation of CERCLA more generally and its natural resource damages provisions particularly.[2]

---

[1] *See, e.g.*, *United States v. Homestake Mining Co. of Cal.*, No. 97-5100 (W.D.S.D. July 13, 1999) ECF No. 57 (transferring 400 acres of culturally significant land and funding for future environmental monitoring to Cheyenne River Sioux Tribe); *United States v. Alcoa Inc.*, No. 7:13-cv-00337 (N.D.N.Y. July 17, 2013) ECF No. 4 (payment of $8,387,898 for St. Regis Mohawk Tribe to implement Tribal cultural restoration projects).

[2] The United States has previously filed briefs on the interpretation of CERCLA during appeals in this case, first opposing *certiorari* in response to an invitation for the views of the Solicitor General, *Teck Cominco Metals, Ltd. v. Pakootas*, 552 U.S. 1095 (2008), and second in this Court as amicus-curiae in support of Plaintiffs-Appellees, *Pakootas v. Teck Cominco Metals, Ltd.*, 830 F.3d 975 (9th Cir. 2016).

## SUMMARY OF THE ARGUMENT

Decades of releases of hazardous substances by defendant Teck Cominco Metals, Ltd. ("Teck") have injured the fish, benthic organisms, and sediments of the Upper Columbia River, which forms the eastern and southern boundary of the Colville Reservation. The Confederated Tribes of the Colville Reservation ("Tribes") seek damages for their members' lost "use" of natural resources that are central to the Tribes' culture. 42 U.S.C. § 9651(c)(2). The district court granted Teck summary judgment on the Tribes' natural resource damages claim, holding that such a claim "involv[ing] damages with a cultural component" is not cognizable under CERCLA.

But nothing in CERCLA, Interior's regulations, or precedent supports the district court's conclusion that trustees are barred from recovering NRD if the injured natural resources were used by tribal members or the lost uses had a cultural dimension. The ordinary meaning of "use" easily captures the ceremonial, subsistence, and other cultural uses of natural resources that the Colvilles claim here.

The district court's judgment should be reversed, and the Tribes' NRD claim remanded for further proceedings.

## ISSUE PRESENTED

Whether CERCLA authorizes recovery of damages for an Indian tribe's lost interim use of a natural resource if that use has a cultural dimension.

## STATEMENT OF THE CASE

### I. Legal background

#### A. CERCLA

Congress enacted CERCLA in 1980 to "both provid[e] a mechanism for cleaning up hazardous-waste sites and impos[e] the costs of the cleanup on those responsible for the contamination." *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 7 (1989) (citation omitted). As a complement to its provisions for response actions to clean up environmental contamination, 42 U.S.C. § 9607(a)(4)(A), CERCLA grants the United States, States, and Tribes a cause of action against responsible parties for "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release [of a hazardous substance]." *Id.* § 9607(a)(4)(C). A federally recognized Tribe may be a trustee under CERCLA for natural resources "belonging to, managed by, controlled by, or appertaining to such [T]ribe, or held in trust for the benefit of such [T]ribe" or natural resources owned by a Tribal member that are subject to a trust restriction limiting transfer. *Id.* § 9607(f)(1).

CERCLA provides that "[t]he measure of damages in any [§ 9607(a)(4)(C) NRD] action . . . shall not be limited by the sums which can be used to restore or replace" natural resources. *Id.* § 9607(f)(1). But Congress did not fully specify how to measure natural resource damages. It instead directed the President (later delegated to

Interior[3]) to promulgate regulations for assessing NRD, *id.* § 9651(c)(1), specifying that the regulations had to:

> identify the best available procedures to determine such damages, including *both direct and indirect injury*, destruction, or loss and shall take into consideration factors *including, but not limited to*, replacement value, *use value*, and ability of the ecosystem or resource to recover.

*Id.* § 9651(c)(2) (emphasis added).

### B. Implementing regulations

Interior first promulgated those regulations in 1986.[4] 51 Fed. Reg. 27,674 (Aug. 1, 1986) (codified at 43 C.F.R. pt. 11). In its review of the regulations, the D.C. Circuit concluded that "Congress intended the damage assessment regulations to capture fully all aspects of loss" and that Interior had "erroneously construed the statute" to preclude certain methods to determine use values. *State of Ohio v. U.S. Dep't of the Interior*, 880 F.2d 432, 463-64 (D.C. Cir. 1989).[5] The court remanded the regulations to Interior with instructions "to consider a rule that would permit trustees to derive use values for natural resources by summing up all reliably calculated use values,"

---

[3] Exec. Order No. 12,316, 46 Fed. Reg. 42,237 (Aug. 20, 1981), as amended by Exec. Order No. 12,580, 52 Fed. Reg. 2,923 (Jan. 29, 1987).

[4] The regulations are known as the Type B natural resource damage assessment and restoration regulations and are intended for more complex assessments. The Type A regulations are more streamlined and apply to simpler assessments.

[5] The D.C. Circuit has exclusive jurisdiction over challenges to regulations promulgated under CERCLA. 42 U.S.C. § 9613(a).

including "'passive' use" values such as "[o]ption and existence values" which *"prima facie*, ought to be included in a damage assessment." *Id.* at 464.

Interior issued revised regulations in 1994, 59 Fed. Reg. 14,262 (Mar. 25, 1994), and further revised the regulations in 2008, 73 Fed. Reg. 57,259 (Oct. 2, 2008). The current regulations define "use value" as "the economic value of the resources to the public attributable to the direct use of the services provided by the natural resources." 43 C.F.R. § 11.83(c)(1)(i). "Services" is a term of art that includes "the physical and biological functions performed by the resource including the human uses of those functions." *Id.* § 11.14(nn). "[C]ompensable value" describes the full measure of recoverable natural resource damages to include both: (1) the costs of returning the natural resources to their baseline condition;[6] and (2) "the amount of money required to compensate the public for the loss in services provided by the injured resources between the time of the discharge or release and the time the resources are fully returned to their baseline conditions, or until the resources are replaced and/or equivalent natural resources are acquired." *Id.* § 11.83(c)(1). The latter category of loss is referred to as "interim use loss" or "interim service loss." *See Alaska Sport Fishing Ass'n v. Exxon Corp.*, 34 F.3d 769, 772 (9th Cir. 1994) ("[G]overnment trustees are entitled to recover for all lost-use damages on behalf of the public, from the time of

[6] Baseline means "the condition or conditions that would have existed at the assessment area had the discharge of oil or release of the hazardous substance under investigation not occurred." 43 C.F.R. § 11.14(e).

any release until restoration"); *Ohio*, 880 F.2d at 448 (Congress "legislate[d] specially to insure that interim use value damages would be added to" the measure of damages).

## II. Statement of facts and procedural history

Teck's integrated lead/zinc smelter in Trail, British Columbia is among the world's largest. From approximately 1906 until 1995, the smelter's discharges to the Columbia River included the heavy metals arsenic, copper, lead, mercury, zinc, and cadmium. 4 ER 662. The Tribes alleged in their Fourth Amended Complaint that as a result of these discharges, Teck is liable for damages to, destruction of, or loss of natural resources at the Upper Columbia River site ("Site") for which the Tribes are a natural resource trustee, including loss of use of such resources and costs of restoration, replacement, or acquisition of equivalent resources. 4 ER 687.

As this Court has already acknowledged, the Upper Columbia River has held "great significance" to the Colvilles, "[f]rom time immemorial." *Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 572 (9th Cir. 2018). Historically, the Tribes "depended on the River's plentiful fish for their survival and gave the River a central role in their cultural traditions." *Id.* They "continue to use the Upper Columbia River to this day for fishing and recreation," and retain treaty rights to fish in the River. *Id.*

At the Tribes' request, EPA began assessing contamination at the Site under CERCLA in October 1999. The contamination extends for approximately 150 miles between the Canadian border and the Grand Coulee Dam. The Site was determined to be eligible for listing on the National Priorities List, although it has not yet been

listed. 89 Fed. Reg. 16,498 (proposed Mar. 7, 2024). In 2004, two members of the Tribes (later joined by the Tribes themselves and the State of Washington) sued Teck under the CERCLA citizen-suit provision, 42 U.S.C. § 9659(a)(1).

The Tribes and the State jointly claim NRD based on injury to the Upper Columbia River's biological resources consisting of (1) lost ecological services based on injured benthic organisms in river sediment, and (2) recreational fishing service losses based on site-specific fish advisories for elevated mercury levels. Teck moved for partial summary judgment on Plaintiffs' ecological injury claim, but not their claim for lost recreational fishing. 2 ER 014. The district court denied the motion. 2 ER 037-043.

The Tribes also separately seek damages for lost uses of natural resources that are specific to their members. The Tribes' claim is supported by alternative valuations based on: (1) lost tribal fishing trips due to the mercury fish advisories (separate and apart from the recreational fishing in the Plaintiffs' joint NRD claims); (2) a contingent valuation study that estimates the value to tribal members of an uncontaminated river; and (3) a valuation of damages based on the costs of projects for redressing natural resource service losses.

Teck moved for partial summary judgment on the Tribes' separate NRD claim. Teck argued that what the Tribes called "tribal service loss" was a claim for injury to "cultural resources" or "tribal resources," terms which do not appear in CERCLA, not an authorized claim for injury to "natural resources." *See, e.g.*, 2 ER 218 (claim

"describes a *cultural* injury, not a natural resource injury"), 225 ("cultural resources are not recoverable 'natural resources' under CERCLA"); 052 ("CERCLA simply does not contain any language suggesting 'cultural' injuries, as opposed to natural resource injuries, were to be compensated").

The Tribes' response explained that the claimed "damages include service [*i.e.*, use] losses, including use and nonuse values due to *natural resource* injuries," 2 ER 096 (emphasis added), and that "the service losses caused by Teck's *harm to the natural resources* included the loss of practices that were central to the tribe's cultural life." 2 ER 120 (internal quotation marks omitted) (emphasis added).

The district court nevertheless adopted Teck's framing and concluded that the Tribes' lost use claim was not authorized by CERCLA, stating:

> There is no express or implied reference to cultural resources in the language of CERCLA. Whether reviewing CERCLA itself or relevant regulations or case law, there is no reference to 'cultural' or 'tribal service' damages. Neither the statute nor the regulations reference a cultural or tribal 'connection' or 'relationship' with a particular resource, let alone possible recovery from loss or damage to that connection or relationship. Though the impacts of Defendant's smelter facility's environmental contamination on the Columbia River are serious, *cultural resource damages are simply not recoverable under CERCLA*.

1 ER 006 (emphasis added). Despite acknowledging that the Tribes had termed the claims at issue "Tribal Service Loss" claims, 1 ER 002, the court went on to assert, without reference, that the Tribes claimed that "their altered relationship with the Columbia River is a specific *cultural resource damage unto themselves*" and "*in addition to* their CERCLA natural resource damage claims." 1 ER 003 (emphasis added). The

court additionally found that NRD under CERCLA had a single purpose: "to compensate the public by providing for the recovery of the funds that are necessary . . . to restore or replace injured natural resources." 1 ER 005.

The district court twice declined to provide a more detailed explanation for its ruling. First, in denying the Tribes' motion for reconsideration, the court "disagree[d]" that it had conflated resource injury and service loss. 2 ER 010-11 (whether called "cultural resource damages or lost services, this is not the type of loss contemplated by Congress"). Second, in granting the Tribes' renewed motion to certify its summary judgment order for interlocutory appeal under 28 U.S.C. § 1292(b), the court reiterated its holding that "there are no express or implied references to *cultural resource damages* in the language of CERCLA," broadly asserting that "[NRD] claims [are] . . . not cognizable under CERCLA if they involve[] damages with a *cultural component*." ECF No. 2906 at 3-4 (emphasis added). The court acknowledged that its decision is in "conflict" with the D.C. Circuit's holding in *Ohio* that "nonuse services . . . are actionable under CERCLA" and that its decision failed to address *Ohio*. *Id.*

## ARGUMENT

The Tribes' claims to recover damages for losses suffered by tribal members because of Teck's hazardous substance releases in the Upper Columbia River fit squarely within CERCLA's provision for damages for "direct and indirect injury," including the "use value" associated with such injury, 42 U.S.C. § 9651(c)(2). *See*

Fourth Amended Complaint, 4 ER 677-690. During discovery, the Tribes' experts presented three methods for valuing the Tribes' lost uses of contaminated natural resources: (1) lost fishing trips by tribal members due to the mercury contamination (which the Tribes asserted did not entirely overlap with the joint claim for the loss of recreational fishing); (2) the total value of an uncontaminated river; and (3) a plan presenting actions to restore the equivalent of lost uses with associated implementation costs. 2 ER 020-026.

Teck responded with the purely legal argument that neither CERCLA nor its regulations expressly or impliedly provide for a "tribal service loss" claim or a "cultural service loss" claim, and that "[t]he only courts to speak squarely on the issue have rejected the concept." 2 ER 226 (citing *Coeur d'Alene Tribe v. Asarco Inc.*, 280 F. Supp. 2d 1094 (D. Idaho 2003), and *In re Gold King Mine Release*, 669 F. Supp. 3d 1146 (D.N.M. 2023)). Teck also made several record-based arguments.[7] *See id.* 228-33.

The district court accepted Teck's legal argument and did not address its record-based arguments. The district court incorrectly interpreted CERCLA, ignored relevant regulations in response to caselaw, and misplaced reliance on two inapposite district court decisions. This Court should reverse the district court's sweeping

[7] The record-based arguments include: (1) the Tribes' claimed losses are not actually connected to an injury to natural resources; (2) the Tribes were not proposing to use the damages to "restore, replace, or acquire the equivalent of [injured] natural resources" as assertedly is required by 42 U.S.C. § 9607(f)(1); and (3) two of the Tribes' three methods for quantifying their losses are impermissible. 2 ER 228-233.

rejection of the Tribes' claims and remand for the district court to apply the correct legal standards.

## I. CERCLA authorizes natural resource damages for the lost uses asserted by the Tribes

### A. CERCLA entitles Indian tribes to damages for lost uses caused by injuries to natural resources.

This appeal concerns a straightforward matter of statutory interpretation – whether a CERCLA claim for "damages for injury to, destruction of, or loss of natural resources," 42 U.S.C. § 9607(a)(4)(C), encompasses compensation for interim lost uses of injured natural resources where Tribal members' diminished uses have a cultural dimension. To interpret a statute, this Court will "utilize 'traditional tools of statutory construction,'' including the ordinary meaning of terms at the time Congress enacted the statute, *Trim v. Reward Zone USA LLC*, 76 F.4th 1157, 1161 (9th Cir. 2023) (citations omitted), and the context of particular words and provisions within the overall statutory scheme. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000); *see also, e.g., Larson v. Saul,* 967 F.3d 914, 922 (9th Cir. 2020) ("We evaluate the plain text of the statute, its object and policy, the law's surrounding provisions, and the legislative history of its enactment.").

Rather than undertaking this required analysis, the district court instead accepted Teck's mischaracterization of the Tribes' claims as seeking "cultural resource damages" and limited its statutory analysis to determining whether the term "cultural" appeared in the statute. This errant focus on the "cultural" aspects of the claim

departed from the relevant statutory analysis of whether the Tribes' NRD claim was premised on a human "use" of the Upper Columbia River sufficient to be recognized under CERCLA.

Multiple provisions in CERCLA demonstrate Congress's intent to authorize natural resource trustees to recover damages for the types of lost uses claimed by the Tribes. First, Congress directed the President to promulgate regulations to guide the assessment of NRD that indicates a broad array of recoverable damages. The regulations had to:

> identify the best available procedures to determine such damages, including *both direct and indirect injury*, destruction, or loss and shall take into consideration factors *including, but not limited to*, replacement value, *use value*, and ability of the ecosystem or resource to recover.

42 U.S.C. § 9651(c)(2) (emphasis added). Notably, Congress did not circumscribe the range of recoverable damages but provided instead that the recoverable damages include *at least* those specified in the statute and, notably, "use value."

Because CERCLA does not define "use value," the words should be given their ordinary meaning. *U.S. Commodity Futures Trading Comm'n v. Monex Credit Co.*, 931 F.3d 966, 973 (9th Cir. 2019) (citing *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012)). Webster's defines "use" to include "a method or manner of employing or applying something" and "a particular service or end." *Webster's New Collegiate Dictionary* 1279 (1979). Nothing in the common meaning of this term suggests that cultural, ceremonial, religious or other tribe-related functions should be excluded

from the category of human uses. *Cf. Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212, 215 (2020) (courts cannot read limitations into a statute which the statute does not contain).

This reading is consistent with CERCLA's purposes. *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 880 (9th Cir. 2001) ("we examine the statute [CERCLA] as a whole, including its purpose and various provisions"); *see also Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.,* 976 F.2d 1338, 1340 (9th Cir. 1992) (courts are to "construe CERCLA liberally to achieve [its] goals") (citation omitted). First among these is "assur[ing] that parties responsible for hazardous substances bore the cost of remedying the conditions they created." *See, e.g., Pinal Creek Grp. v. Newmont Mining Corp.*, 118 F.3d 1298, 1300 (9th Cir.1997) (quoting *Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1455 (9th Cir. 1986)). More specifically, the broad range of damages to be assessed under Congress' direction in 42 U.S.C. § 9651(c)(2) furthers "Congress's intent to recover for the *full damages* resulting from a release." *Nat'l Ass'n of Mfrs. v. U.S. Dep't of Interior*, 134 F.3d 1095, 1112 (D.C. Cir. 1998) (citing *Ohio*, 880 F.2d at 464) (emphasis added); *New Mexico v. Gen. Elec. Co.*, 467 F.3d 1223, 1244–45 (10th Cir. 2006) (full recovery includes restoration or replacement costs plus allowing for damages for interim loss of use).[8]

[8] Although not at issue here, Congress sought to further ensure the full measure of recovery by granting trustees the ability, at their option, to claim "the force and effect of a rebuttable presumption . . . in any administrative or judicial proceeding" if they *Cont.*

Recovery of natural resource damages serves a purpose beyond the cleanup of hazardous substances and recovery of cleanup costs, which are allowed under 42 U.S.C. § 9607(a). In general, response actions (whether undertaken by EPA or responsible parties) remove or isolate hazardous substances from the environment to prevent or minimize future harm to human health from the contamination. Although response actions often mitigate ecological impacts, they are not necessarily designed to repair the degradation of natural resources that occurred while the contamination was uncontained, including harm to species and habitats and disruption of human uses of natural resources. At some sites, these injuries can persist for decades after the cleanup. Indeed, injured resources may never fully recover. A reading of CERCLA's NRD provisions commensurate with the broad sweep of its text is necessary to fully implement CERCLA's purpose.

Legislative history also supports the conclusion that Congress intended to authorize NRD claims for interim lost uses like those claimed by the Tribes. The pertinent House Report explained that the "shall not be limited by" language concerning the measure of damages in 42 U.S.C. § 9607(f)(1) concerns a situation "in which the amount of damages caused by a release of hazardous substances is in excess of the amount that could realistically or productively be used to restore or replace

---

conducted a natural resource damage assessment in conformity with the regulations called for in 42 U.S.C. § 9651(c)(2). *Id.* § 9607(f)(2)(C).

those resources." H.R. Rep. No. 99–253(IV), at 50 (1985), as reprinted in 1986 U.S.C.C.A.N. 3068, 3080. As such, the report explained that "the total amount of damages may include the costs of restoration and the value of all the lost uses of the damaged resources . . . from the time of the release up to the time of restoration. Since the damages contemplated by CERCLA include both, the total amount of damages recoverable *would exceed the restoration costs alone*." *Id.* (emphasis added).

Courts repeatedly have cited this history as confirmation that CERCLA authorizes damages for interim lost use. For example, in its evaluation of whether the natural resource damages provisions in CERCLA and the Clean Water Act permitted recovery for "public loss of use and enjoyment that occurs prior to 'recovery,' or cleanup" related to the Exxon Valdez oil spill, *Alaska Sport Fishing Ass'n*, 34 F.3d at 772, this Court cited the House Report in holding that "government trustees are entitled to recover for all lost-use damages on behalf of the public, from the time of any release until restoration." *Id.* (citing, inter alia, H.R. Rep. No. 99–253(IV), at 50). The D.C. and Tenth Circuits similarly looked to this legislative history to describe the purposes of CERCLA's natural resource damages remedy: "The legislative history . . . makes the meaning of § 9607(f)(1) abundantly clear. The *measure* and *use* of damages arising from the release of hazardous waste is restricted to accomplishing CERCLA's essential goals of restoration or replacement, while also allowing for damages due to *interim loss of use*." *New Mexico*, 467 F.3d at 1244–45 (citation omitted, emphasis added); *accord Ohio,* 880 F.2d at 454 & n. 34.

Second, CERCLA similarly does not circumscribe all the permissible methods of measuring recoverable NRD, but instead provides that "[t]he measure of damages in any [NRD] action . . . *shall not be limited* by the sums which can be used to restore or replace" natural resources. 42 U.S.C. § 9607(f)(1) (emphasis added); *see also, e.g.*, *Alaska Sport Fishing Ass'n,* 34 F.3d at 772. Although CERCLA requires that the recovered damages be used "to restore, replace, or acquire the equivalent of [the injured] natural resources," 42 U.S.C. § 9607(f)(1), how such damages are ultimately used is not an element of an NRD claim. *Id.* § 9607(a)(4)(C) (liability for "damages for injury to, destruction of, or loss of natural resources [and reasonable costs of assessment] . . . resulting from" a release of hazardous substances).

Third, CERCLA specifically authorizes Indian tribes to serve as natural resource trustees that can bring their own NRD claims, 42 U.S.C. § 9607(f)(1). That necessarily means that losses suffered by tribal members because of injuries to natural resources used for various purposes are compensable, whether the uses are characterized as recreational, ceremonial, subsistence, or cultural. *See Pakootas*, 905 F.3d at 572 (the Tribes "historically depended on the River's plentiful fish for their survival and gave the River a central role in their cultural traditions . . . [a]nd continue to use the Upper Columbia River to this day for fishing and recreation").

In sum, CERCLA's text, structure, purposes, and its legislative history all confirm that the statute authorizes trustees to recover damages for the types of lost uses claimed by the Tribes.

### B. Interior's regulations recognize natural resource damages for the Tribes' lost uses and assessment methodologies.

CERCLA's authorization of interim-loss-of-use claims for natural resource damages is also consistent with Interior's longstanding interpretation embodied in its regulations. Notably, the regulatory provisions pertinent to the Tribes' interim lost-use claims are included in Interior's regulations precisely because the D.C. Circuit in *Ohio* interpreted the statute and held that Interior's initial regulations *too narrowly* defined the categories of recoverable damages (including damages for interim lost uses) and incorrectly circumscribed the methods for assessing such damages.

Interior's initial regulations were challenged in the D.C. Circuit, as relevant here, on two elements that petitioners claimed rendered them too limited on the scope of recoverable NRD. The first challenge concerned the "lesser-of rule," under which the recovery of damages would be limited to "the lesser of: restoration or replacement costs; or diminution of use values," under the premise that it would be irrational to restore a natural resource if its use value were less than the costs of restoration. *Ohio*, 880 F.2d at 441 (quoting 43 C.F.R. § 11.35(b)(2) (1987)). After examining CERCLA's text, structure, purposes and key legislative history, the D.C. Circuit emphasized the significance and clarity of CERLCA's requirement that NRD not be limited to restoration or replacement cost: "§ 107(f)(1)'s 'shall not be limited by' language was not designed to afford [Interior] the liberty of mandating a lesser measure of damages in all or most cases; rather, the measure of damages must not

only be sufficient to cover the intended restoration or replacement uses in the usual case but may in some cases *exceed restoration cost* by *incorporating interim lost use value as well*." *Ohio*, 880 F.2d at 448 (emphasis added). The court found that CERCLA unambiguously precludes a "lesser-of" rule, *id.* at 444, and showed Congress' concern that restoration costs not amount to a "damages ceiling." *Id.* at 446.

The second aspect of Interior's regulations challenged in *Ohio* was a requirement that assessment methods be subject to a hierarchy of methods for determining "use values" that prioritized market value. *Id.* at 462 (citing 43 C.F.R. § 11.83(c)(1) (1987)). In rejecting this approach as "an erroneous construction of the statute," *id.* at 464, the D.C. Circuit explained that "Congress intended the damage assessment regulations to *capture fully all aspects of loss*." *Id.* at 463 (emphasis added). Indeed, contrary to the district court's determination here that NRD exist *solely* to compensate for restoration or replacement value, 1 ER 005, the D.C. Circuit interpreted the statute as allowing recovery for "*interim use value*, the value of the lost uses from the time of the spill until the completion of the restoration project." *Ohio,* 880 F.2d at 454 n.34 (emphasis added).

The D.C. Circuit provided specific direction for Interior to correct its erroneous construction in revised regulations on remand, including by permitting trustees "to derive use values for natural resources by summing up all reliably calculated use values" and by holding that "'passive' use" values such as "[o]ption and existence values . . . *prima facie*, ought to be included in a damage assessment." *Id.* at

464. The current regulations explain that their purpose is to encompass the full measure of damages, which includes, "the cost of restoration or rehabilitation of the injured natural resources to a condition where they can provide the level of services available at baseline" or the cost to replace or acquire equivalent natural resources that provide such services. 43 C.F.R. § 11.80(b). Damages may also include interim service loss, *i.e.*, "the compensable value of all or a portion of the services lost to the public for the time period" from hazardous substance release until the attainment of conditions equivalent to the baseline. *Id.* The regulations further define "compensable value" to include specifically the type of damages sought by the Tribes here and expressly found by the D.C. Circuit to be required by CERCLA, *i.e.*, "the economic value of *lost services* provided by the injured resources, including both *public use* and *nonuse values* such as *existence and bequest values*." *Id.* § 11.83(c)(1) (emphasis added); *see also Ohio*, 880 F.2d at 464.[9]

In its subsequent review of Interior's revised regulations, the D.C. Circuit held that Interior's determination reflected in the regulations that NRD may include "the value of services lost while awaiting restoration of the resources" is an interpretation

[9] District courts have recognized the recoverability of nonuse values, such as existence value, in CERCLA natural resource damages cases. *See, e.g.*, *Idaho v. S. Refrigerated Transp., Inc.,* No. 88-1279, 1991 WL 22479, at *18 (D. Idaho Jan. 24, 1991) (denying summary judgment on "commercial, existence, and recreational" value claims but "recogniz[ing] that these three values do exist and would be appropriate items of damage if proved at trial"). The Tribes' contingent valuation study method of assessment relies on existence value.

that "fits easily with the broad provisions of the CERCLA." *Kennecott Utah Copper Corp. v. U.S. Dep't of the Interior*, 88 F.3d 1191, 1228 (D.C. Cir. 1996). The *Kennecott* court went on to explain: "[l]ike the Ninth Circuit, we think that to disallow recovery for interim lost services would be to rely upon 'a strained and hypertechnical reading' of the statutes in disregard of the broad public policy underlying them." *Id.* at 1228 (quoting *Alaska Sport Fishing Ass'n*, 34 F.3d at 772).

### C. The district court erred in its interpretation of CERCLA's text, implementing regulations, and relevant precedent.

In rejecting what it characterized as the Tribes' claim for "cultural resource damages" as not cognizable under CERCLA, the district court committed multiple errors. First, beyond searching for the exact word "cultural" in CERCLA and not finding it, the district court failed to perform any statutory analysis or apply the traditional tools of construction to determine whether the lost uses that undergird the Tribes' claim (which include subsistence, ceremonial, and cultural uses) are among those contemplated by the statute. The plain meaning of "use" indicates that they are, and no statutory analysis provided by the district court supports its holding that use damages are not recoverable if they have a "cultural component."

Second, the district court erred by interpreting CERCLA to conclude that natural resource damages had a single purpose: "to compensate the public by providing for the recovery of the funds that are necessary . . . to restore or replace injured natural resources." 1 ER 005. That conclusion is contradicted by the statute,

which states that damages "shall not be limited by the sums which can be used to restore or replace," and by abundant case authority, as already discussed. 42 U.S.C. § 9607(f)(1); *see supra* at 11-20.

Third, the district court erred by failing to address on-point authority interpreting CERCLA's natural resource damages provisions, all of which uniformly recognize the breadth of damages for which Congress intended to permit recovery, including for interim lost uses. *Ohio,* 880 F.2d at 463 ("Congress intended the damage assessment regulations to *capture fully all aspects of loss*.") (emphasis added); *Alaska Sport Fishing Ass'n*, 34 F.3d at 772 ("government trustees are entitled to recover for all lost-use damages on behalf of the public, from the time of any release until restoration."); *Kennecott*, 88 F.3d at 1228 (excluding interim lost-use claims would disregard CERCLA's "broad public policy").

In fact, the district court explained that its decision on the "scope of CERCLA's applicability" did not address the D.C. Circuit's *Ohio* decision. 2 ER 029-030. Rather, the court acknowledged a "conflict" between its holding and *Ohio* and explained that it relied instead exclusively on two district court decisions. *Id.* Both of those decisions are inapposite, neither offers any support for the district court's conclusion that use values with a "cultural component" are not recoverable, and neither examines the statute, regulations, or relevant case law.

In the first decision, *Coeur d'Alene Tribe v. Asarco Inc.*, 280 F. Supp. 2d 1094 (D. Idaho 2003), the court decided numerous factual and legal issues following a lengthy

bench trial in a long-running case involving NRD claims resulting from mining in the Coeur d'Alene Basin. The court made the following "Finding[] of Fact" relating to "Injury from Releases": "Cultural uses of water and soil by the Tribe are not recoverable as natural resource damages." *Id.* at 1107. Despite reading like a legal conclusion, the case has no legal analysis explaining why interference with cultural uses due to contamination of natural resources is not a cognizable claim. The Coeur d'Alene's claim for NRD presented many factual and legal issues, but Asarco's primary argument was that the Tribe was not a trustee for the contaminated natural resources.[10] Notably, the court's legal analysis referred to cultural uses only in connection with its analysis of trusteeship. Describing the Tribe's trusteeship (and thus eligibility to assert certain claims under CERCLA) as "a question of both fact and law," *id.* at 1115, the court held that, "[w]hile the Tribe may use certain natural resources in the exercise of their cultural activities, such use does not rise to the level

[10] The Coeur d'Alene Tribe had argued that its NRD claim was based on "metals contamination on and off-Reservation [that] interferes with the Tribe's unobstructed use and enjoyment of surface water and sediment resources for recreational, commercial, spiritual and cultural purposes," including for sweats and harvesting of water potatoes. D. Idaho No. 96-cv-122, ECF No. 1122 at 4-5 (filed April 30, 2001). The Tribe further argued that it was the trustee for these injured resources. *Id.* at 5-7. Asarco countered that the court did not have to decide whether the Tribe's claim for such losses was cognizable under CERCLA because all the injured natural resources were assertedly located off-reservation and the Tribe was not a trustee for those resources. ECF No. 1231 at 54-55 (filed Sept. 26, 2001). The Tribe disagreed with Asarco's factual and legal assertions as to the nature of its damages and trusteeship. ECF No. 1239 (filed Oct. 9, 2001).

of making a natural resource 'belong or be connected as a rightful part or attribute' for purposes of trusteeship analysis." *Id.* at 1117.

The Idaho court reconsidered its trusteeship holding in 2005 and concluded that both the United States and the Coeur d'Alene Tribe are trustees for purposes of CERCLA over the federal and tribal land and related natural resources based on their involvement in the management and control of such natural resources. *United States v. Asarco Inc.*, 471 F.Supp.2d 1063, 1068-69 (D. Idaho 2005). The ultimate NRD settlement included the Coeur d'Alene Tribe. The Colvilles' trusteeship in this case is not questioned. The Colville Reservation extends to the midpoint of the Columbia River, and the Tribes have treaty fishing rights in the River. 4 ER 661.

The second decision, *In re Gold King Mine Release*, 669 F. Supp. 3d 1146 (D.N.M. 2023), is also inapposite as it is not a CERCLA case at all, but rather a state tort law case for damages. The district court examined the issue of whether certain "restorative damages" claims by the Navajo Nation, including for a "Cultural Preservation" program, were pre-empted by CERCLA's natural resource damages provisions. *Id.* at 1159-60. In finding the claim not to be pre-empted, the court rejected the defendant's characterization of the claim as one for natural resource damages and said that, while the claim was connected to the contaminant spill, the restorative damage claim involved "injuries that are distinct from the injury to the River." *Id.* at 1160. The decision does not analyze the scope of CERCLA natural resource damages claims, let alone the recoverability of damages for interim use loss.

These inapposite trial court decisions do nothing to undercut the weight of the clear authorization for the Tribes' lost use claims under the text of the statute and confirmed by *Ohio* and other court of appeals authority affirming the breadth of CERCLA's framework for NRD recovery.

Fourth, and finally, the district court erred by ignoring Interior's regulations in evaluating the Tribes' claims for interim lost uses, especially insofar as the regulatory provisions relied upon by the Tribes reflect Interior's implementation on remand of the D.C. Circuit's interpretation of CERCLA in *Ohio*.

## II. The interim lost use claims articulated by the Colvilles constitute "natural resource damages" for lost "use value" under CERCLA

The district court determined that the Tribes' natural resource damages claims were not cognizable under CERCLA based on its erroneous statutory interpretation and did not analyze Teck's record-based claims. If this Court concludes that the district court erred in granting partial summary judgment to Teck on its lead statutory interpretation argument, it should remand the case to the district court for fact-finding and consideration of Teck's record-based arguments.

Interior's regulations provide multiple methods for determining "the economic value of lost services provided by the injured resources, including both public use and nonuse values such as existence and bequest values." 43 C.F.R. § 11.83(c)(1).[11]

---

[11] *See also id.* § 11.83(c)(1)(ii) (defining "nonuse value" as "the economic value the public derives from natural resources that is independent of any direct use of the

*Cont.*

Trustees may choose from several economic methods including market price, appraisal, and contingent valuation. *Id.* § 11.83(c)(2). Trustees may also opt for alternative approaches to measure compensable value, such as determining "the public's willingness to pay for the lost service" or estimating "the cost of a project that restores, replaces, or acquires services equivalent of natural resource services" that have been lost pending return to the baseline condition. *Id.* § 11.83(c)(3).

The Tribes have presented claims that fit within the category of NRD and employ permissible methodologies for valuing those damages as informed by relevant judicial precedent and Interior's regulations. Specifically, they allege that the contamination from Teck's refinery has deprived them of the use of the River for fishing necessary for their subsistence and for ceremonies. The Tribes' claims warrant further consideration by the district court on remand.

For example, the Tribes' claim to lost-use damages based on the reduction of fishing trips by tribal members due to Teck's contamination of the Site is a straightforward, frequently asserted claim in the CERCLA context. *See id.* § 11.83(c)(1)(i). Indeed, under the regulations, fish consumption advisories for elevated mercury, like those issued for the Upper Columbia River, create a *per se*

services provided"); *Ohio*, 880 F.2d at 476 n.73 (existence value is the "dollar amount an individual is willing to pay although he or she does not plan to use the resource, either at present or in the future. The payment is for the knowledge that the resource will continue to exist in a given state of being.") (citation omitted).

biological natural resource injury. *See id.* § 11.62(f)(1)(iii). The Tribes' claim quantified the interim lost uses experienced by tribal members associated with that *per se* biological injury and assigned a monetary value to their lost fishing trips to calculate damages. The Tribes based their loss on subsistence and ceremonial uses of the river for such trips. *See* 3 ER 553.

Similarly, contingent valuation (or "stated preference") studies are a commonly accepted economic tool to value natural resource damages. To measure lost human services, contingent valuation studies analyze how individuals respond to the injured natural resource (in this case, a river contaminated by hazardous substances). Interior's NRD regulations allow for contingent valuation studies to estimate appropriate compensation for lost uses. 43 C.F.R. § 11.83(c)(2).

As an alternative method to the contingent valuation study, the Tribes also developed a plan to estimate the cost of restoring the natural resource service losses they experienced due to Teck's actions. Interior's regulations expressly recognize such a method representing "the cost of a project that restores, replaces, or acquires services equivalent of natural resource services" that have been lost pending return to the baseline condition. *Id.* § 11.83(c)(3).

Although Teck may dispute the methods and resulting valuations developed by the Tribes' experts using these alternate methods, those are issues of triable fact. *See* W*yler Summit P'ship v. Turner Broad. Sys., Inc.*, 235 F.3d 1184, 1192 (9th Cir. 2000). The Tribes have presented sufficient questions of disputed material fact, using established

methods, in a cognizable legal framework to survive summary judgment. *Lolli v. Cnty. of Orange*, 351 F.3d 410, 414 (9th Cir. 2003). Thus, this Court should reverse the district court's legal error and remand for further proceedings. *Roth v. Foris Ventures, LLC,* 86 F.4th 832, 838 (9th Cir. 2023) ("[a]s a federal court of appeals, we must always be mindful that we are a court of review, not first view.") (quotation marks, citation omitted).

## CONCLUSION

The judgment of the district court should be reversed.

Respectfully submitted,

TODD KIM
*Assistant Attorney General*

s/David S. Gualtieri
DAVID S. GUALTIERI
JOSEPH M. MANNING
*Attorneys*
*Environment and Natural Res. Div.*
*U.S. Department of Justice*
*P.O. Box 7415*
*Washington, D.C. 20044*
*(202) 514-4767*
*David.Gualtieri@usdoj.gov*

DECEMBER 12, 2024
90-1-24-03835

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s):** 24-5565

I am the attorney or self-represented party.

**This brief contains 6,884 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  [ ] it is a joint brief submitted by separately represented parties.
  [ ] a party or parties are filing a single brief in response to multiple briefs.
  [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ David S. Gualtieri **Date** December 12, 2024
*(use "*s/[typed name]*" to sign electronically-filed documents)*

## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

S/ DAVID S. GUALTIERI
DAVID S. GUALTIERI
COUNSEL FOR THE UNITED STATES

DATED: DECEMBER 12, 2024